**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **BRITTANY HUDSON,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | § | **Civil Action No. 1:20-cv-00928** |
| | § | |
| **LINCARE INC.** | § | |
| | § | |
| **Defendant.** | § | |

<u>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**</u>

Defendant Lincare Inc. ("Lincare" or "Defendant") files this Motion for Summary Judgment and Brief in Support and states as follows:

## I.  STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

1.  Plaintiff began her employment with Lincare in April 2015 in Astoria, Oregon. (Pl. 35:18-25.)[2] Plaintiff worked as a Sales Representative ("Sales Rep"). (Pl. 36:9-10.) Plaintiff sold respiratory therapy equipment, oxygen, supplies, and services to healthcare providers. (Pl. 38:22-23; 39:30-40:3.) Plaintiff made sales calls, established and maintained relationships with referral sources in the medical community, completed deliveries and paperwork to ensure the sale can be billed, and tracked her sales. (Pl. 38:10-21, Ex. 6.)

2.  Lincare has in place anti-discrimination, anti-harassment, and anti-retaliation policies which prohibit discrimination and harassment. (JL Ex. 3.) It has a Reporting Procedure that provides a number of reporting avenues for employees. (JL 21:12-22:18, Ex. 3.) Its HR Department will quickly and thoroughly investigate any such complaints. (JL 37:17-25.) Plaintiff acknowledged receiving and reviewing these policies and procedures. (Pl. 46:23:47:6, Ex. 3.)

3.  On July 13, 2017, Plaintiff was issued a documented verbal warning for failing to track her sales.[3] (Pl. Ex. 8.) On April 23, 2018, Plaintiff was issued a documented verbal warning for failing to achieve the minimum performance standards. (Pl. 82:1-9, 152:24-153:2, Ex. 8.)

4.  In December 2018, Plaintiff contacted Lincare's Austin, Texas center (the "Austin Center") about job openings.[4] (Pl. 71:1-6.) The Austin Center's Manager, Casey Greenway

---

[1] Lincare offers these "undisputed facts" as true for purposes of this Motion only.
[2] After about one year in Astoria, Plaintiff transferred to Portland, Oregon, and then to New Orleans, Louisiana.
[3] Sales Force was an application on the computer or phone used to log her sales calls. (Pl. 88:1-7.)
[4] Plaintiff wanted to move to Austin to be closer to her grandmother. (Pl. 68:1-9.)

("Greenway"), interviewed and approved Plaintiff's transfer.[5] Plaintiff began working there as a Sales Rep on December 10, 2018. (Greenway Dec ¶3.)

5.     The Austin Center had three Customer Service Representatives ("CSR"),[6] Patricia Ruiz ("Ruiz"), Anicia Torres ("Torres"), and Virginia Balli ("Balli"), and two Sales Reps, Plaintiff and Adele Boyd ("Boyd").[7] (Pl. 73-24-74:10, 75:8-17; Greenway Dec ¶4.) All reported to Greenway. (Pl. 72:13-25, 76:3-5.) The CSRs sat in the front of the office; the Sales Reps had an area they shared in the back. (Pl. 117:20-118:9, 118:18-20, 119-15-17.) The offices were separated by a wall. (Pl. 119:1-5.)

6.     Sales Reps performed the majority of their work out of the office on sales calls to doctor's offices, clinics, and other referral sources[8] while CSRs spent all of their time in the office. (Greenway 35:9-22.) Plaintiff did not work at the Austin Center often.[9] (Pl. 73:15-17; Ruiz 19:11-15.) Plaintiff worked outside of the office on Tuesday, Wednesday, Thursday, and Friday. (Pl. 82:13-83:4.) Plaintiff went to the office on Monday mornings to attend the weekly team meeting day. (Pl. 82:13-83:4.) On occasion, Plaintiff would go into the office on other days for a "lunch and learn" or to submit paperwork, but those visits would be quick. (Pl. 82:13-83:4, 83:17-24.)

7.     On June 20, 2019, Greenway held a meeting between Boyd, Ruiz, Torres,[10] and Plaintiff to address issues between the CSRs and Sales Reps (the "June 20 Meeting"). (Pl. 132:3-13.) Boyd sent an e-mail to the Regional Manager, Mike Potter, which the CSRs disagreed with. (JL 41:1-10; Pl. Ex. 9.) During the meeting, Ruiz called Boyd a "bitch." (Pl. 133:19-135:3.) Torres

---

[5] When an employee requests a transfer, the employee is required to go through an interview process with the new center similar to that of a new employee to make sure it is a good fit. (Greenway Dec ¶3.)
[6] The CSRs answer phones, take patient orders, mail out and set up orders, obtain paperwork, and make sure orders and can be billed. (Ruiz 8:14-18.) The CSRs are lower-level employees who do not have any supervisory authority. (Greenway Dec ¶4.)
[7] The office also had a respiratory therapist, Scott Gove ("Gove"), and several drivers. (Pl. 76:9-14.)
[8] Plaintiff was expected to make 10-12 sales calls per day. (Pl. 80:15-25, 81:1-3.)
[9] Ruiz testified that Plaintiff was "hardly ever in the office." (Ruiz 40:24-41:1.)
[10] Ruiz is white, Torres is Hispanic, Boyd is white, and Greenway is white. (Pl. 74:25-75:17.)

stated that the Sales Reps were not doing their job and were "failures." (Pl. 135:18-136:12, Ex. 9.) Greenway immediately told everyone to calm down and not use inappropriate language. (Pl. 136:21-137:5; Greenway 19:2-16.) Plaintiff then confronted Torres and told her to stop using the N-word[11] in the office. (Pl. 138:18-139:9.) Torres asked Plaintiff what she was talking about. (*Id.*) Plaintiff responded that she heard Torres use the N-word in the office a few times. (*Id.*) Torres responded she would not say it when Plaintiff was around to which Plaintiff responded she should not use it period. (Pl. Ex. 9.) Torres then called Plaintiff a "bitch" and explained that she would use the N-word whenever she wanted to, that it was a free country, that Plaintiff could sue her if she wanted, and walked out of the meeting.[12] (Pl. 140:21-141:5, Ex. 9.) Greenway immediately contacted HR to report what occurred.[13] (JL 25:18-25.)

8.      Later, Torres sent Plaintiff a text message apologizing for her comments in the June 20 meeting. (Pl. 158:19-25; Torres 11:13-12:11.) Plaintiff did not respond. (Pl. 159:7-9.)

9.      Plaintiff utilized the Reporting Procedure and contacted HR. (Pl. 141:14-5, 156:5-10.) HR Business Partner, Juanita Lichtenberg ("Lichtenberg"),[14] called Plaintiff back and asked for a written statement of the event and any supporting documentation. (Pl. 142:6-143:12; JL 26:1-9.) On June 21, 2019, Plaintiff sent her statement. (Pl. 153:24-154:13, Ex. 9.)

---

[11] The "N-word" refers to "nigger" or "nigga," as Plaintiff does not recall which version of the word she alleges she heard Torres use. (Pl. 115:21-116:3.)
[12] Plaintiff's recollection of Torres' comments at the June 20 meeting has changed several times. This was the version from Plaintiff's statement to HR, which Plaintiff testified was accurate and written the following day after the meeting. (Pl 153:24-154:13.). It does not state that Torres actually said "n****r" in the meeting. In Plaintiff's Charge, Plaintiff stated that Torres responded "Bitch, Imma say n***** when I want. Imma say n***** if I wanna say n*****. Sue me bitch," and that it was okay for her to use the N-word because she had black friends. (Pl. 146:21-25, 147:17-20, Ex. 1.) In deposition, Plaintiff changed her story further stating Torres called her a "n****r bitch" in the meeting; however, Plaintiff never mentioned this important detail in her initial statement to HR (sent one day after the meeting), charge (filed approximately one month after the meeting), or complaint. *See* (Pl. 140:21-141:5, Ex. 1.) Other witnesses testified that Torres did not actually say the N-word in the meeting at all or call Plaintiff the N-word. (Ruiz 42:1-13; Torres 13:18-23; Greenway 24:2-4; 48:1-10.)
[13] Greenway has been trained by Lincare on how to handle complaints of harassment and discrimination, including immediately contacting HR if there is a complaint. (Greenway 11:9-15; 14:2-5.)
[14] Lichtenberg, a 21-year employee, was an experienced HR Business Partner. (JL 8:6-8; 12:1-4.)

10.     Lichtenberg began an investigation into the incident and Plaintiff's allegations that Torres used the N-word. (JL 26:19-22.) Lichtenberg interviewed and/or took statements from Plaintiff, Ruiz, Torres, Boyd, and Greenway.[15] (JL 53:7-12, 53:23-54:9, 55:1-4, 68:2-10, Ex. 4.) Plaintiff told Lichtenberg that she overheard Torres use the word twice when on the phone and twice in the meeting. (JL 61:25-62:3.) Boyd reported she heard Torres say it once in the office. (JL 55:1-4, Ex. 4 (DEF 521-522).) Torres admitted to Lichtenberg that she said "my n***a you're the best" when talking with a coworker in a friendly/slang manner, but only said the word twice, and that her comments were not directed towards Plaintiff. (JL 55:1-4, Ex. 4 (DEF 523-525).)

11.     On June 25, 2019, **five days after the meeting**, final written warnings were issued to both Ruiz and Torres.[16] (JL 27:1-25; Ruiz 33:19-21, 36:31-37:2.) The final warnings encompassed the events of the June 20 meeting and all inappropriate language used by either employee before then. (JL 75:15-19.) They stated future incidents of discriminatory comments or any retaliatory conduct "will result in the immediate termination." (JL 107:3-16, Ex. 9; Ruiz 37:3-16.) Torres was told to remove the N-word from her vocabulary. (JL Ex. 4.) Per company policy, Lichtenberg did not inform Plaintiff that disciplinary action was issued but told her the matter had been addressed and to contact her if any harassing or retaliatory conduct occurred. (JL 29:10-15.) Plaintiff was not issued disciplinary action for her conduct in the meeting. (Pl. 145:17-21.)

12.     Lincare has not received a complaint that Ruiz or Torres have used inappropriate or discriminatory language after receiving the final warnings. (JL 28:8-12.) Greenway has not observed Ruiz or Torres using discriminatory or offensive language since the final written

---

[15] Lichtenberg maintained an investigation record. (JL Ex. 4.)

[16] Lichtenberg recommended a final written warning rather than a termination because this was the first offense for both employees, her investigation revealed the use of inappropriate language was more of an isolated incident and while very inappropriate, she determined the used of the N-word was not directed towards Plaintiff and only overheard when talking to someone else on the phone. (JL 30:9-16.)

warnings. (Greenway 55:1-4.) Plaintiff did not hear Torres nor any other employee use the N-word after her report to HR on June 20, 2019, or report any other harassment. (Pl. 159:8-18.) After the final written warnings, the CSRs and Sales Reps focused on doing their jobs and did not socialize with one another.[17] (Greenway 39:6-16.)

13.     On July 5, 2019, Plaintiff reported to Lichtenberg that Gove told her Ruiz referred to her as "Aunt Jemima." (Pl. 175:3-10, Ex. 12.) On July 8, 2019, Lichtenberg responded she would look into the issue. (Pl. 177:23-178:4, Ex. 12.) Lichtenberg conducted an investigation which determined that Ruiz made a comment that Plaintiff looked like "Aunt Jemima" because the outfit she was wearing that day resembled the outfit the Aunt Jemima character wore, and did not mean it in a derogatory way. (Ruiz 29:10-22, 30:17-21; Greenway 26:24-27:10.) Plaintiff was not in the office when Ruiz made this comment. (Ruiz 30:5-8.) Greenway was present and immediately told Ruiz she should not compare Plaintiff's outfit to Aunt Jemima. (Ruiz 31:10-14.) Lichtenberg did not recommend further discipline because she could not determine when the comment was made.[18] (JL 83:8-18, 84:20-85:12, 86:18-25; Ex. 4.)

14.     While working for Lincare, Plaintiff applied and interviewed for an open position with Medici.[19] (Pl. 170:15-17, 171:1-9.) On July 18, 2019, Plaintiff received an offer from Medici to be an inside sales representative. (Pl. 43:23-2, Ex. 2.) On July 23, 2019, she accepted the job and signed the offer letter with a start date of August 12, 2019.[20] (Pl. 171:12-15, Ex. 2.)

15.     On July 30, 2019, Plaintiff filed an EEOC charge. (Pl. 32:4-6, 178:19-23, Ex 1.)

---

[17] Plaintiff limited her conversations with Ruiz or Torres after the June 20 meeting other than to discuss patient orders. (Pl. 162:3-7.) Plaintiff continued working amicably with the other CSR who was not present during the June 20 meeting. (Pl. 164:4-8.)

[18] There is some dispute as to when the comment was made. This comment occurred back in March or April of 2019 before Ruiz received the final warning (Greenway 56:23-57:6) but Gove said he thought it occurred June 24 or 25, 2019. (JL Ex. 4.)

[19] Plaintiff does not remember why she started looking for a new job. (Pl. 170:5-9.)

[20] Plaintiff applied for a position and interviewed with a real estate company while working for Lincare. (Pl. 171:18-25.) Plaintiff applied for and was offered a job by PeopleFund in July 2019. (Pl. 190:4-12.)

16.     Plaintiff was not meeting job expectations and sales goals at the Austin Center. (Greenway 57:19-21.) Doctors' offices often contacted Greenway stating that Plaintiff was not making her expected sales calls. (Greenway 61:13-19.) Plaintiff had not entered anything in SalesForce since early July. (JL 102:22:103:1, Ex. 4; Potter Dec ¶6; Greenway Dec ¶10) Greenway informally counseled Plaintiff on these issues. (Greenway 61:20-24.) Potter spoke to Plaintiff about her failure to track sales on several occasions lastly on August 8 and let her know she would be receiving formal disciplinary action soon if she had not completed her Sales Force entries by then. (JL Ex. 4, DEF 531, 535; Potter Dec ¶6.)

17.     On August 9, 2019, Plaintiff resigned without notice. (Pl. 172:17-21, 173:10-17, Ex. 11.) Her resignation e-mail stated that despite her complaints to HR,[21] the harassment and hostile work environment have made it impossible for her to work there and perform her job duties. (Pl. Ex. 11.) Lichtenberg called Plaintiff immediately. (Pl. 179:10-15.) Plaintiff did not think Lichtenberg could fix the situation and her resignation was final. (Pl. 179:23-180:9.) The following Monday, August 12, Plaintiff started at Medici. (Pl. 45:3-5, 178:11-18.)

18.     Plaintiff alleges Boyd told her that Ruiz made comments that Plaintiff was "loud and black" and "ghetto." (Pl. 122:3-6.) Plaintiff did not hear these comments firsthand. (Pl. 186:12-188:17.) Boyd reported these comments to Lichtenberg and they were addressed in the final written warning. (JL 75:15-19, Ex. 4 (DEF 521-522).)

19.     Plaintiff now alleges Torres used the N-word regularly before the June 20 Meeting but does not know how many times.[22] (Pl. 120:20-25.) Torres' use of the N-word was addressed

---

[21] In the resignation e-mail, Plaintiff states she reported racial discrimination and harassment on June 21, July 2, and July 5, 2019. (Pl. Ex. 11.) However, Plaintiff testified that she only remembers making the two reports to Human Resources – the June 20 meeting and the Aunt Jemima comment. (Pl. 177:13-22.)

[22] Plaintiff alleges Torres used the N-word while on telephone calls referring to others. (Pl. 117:2-19; Ex. 1.) Plaintiff alleges Torres used the N-word in the June 20, 2019 meeting. (Pl. 116:15-17.)

in the final written warnings. (JL 27:1-25.) Plaintiff testified she did not hear Torres use the N-word after her report to HR on June 20, 2019. (Pl. 159:8-18.) Plaintiff did not hear anyone else use the N-word. (Pl. 120:7-12.)

20.     Tina Avera was Plaintiff's Area Manager when she first transferred to the Austin Center.[23] (Pl. 103:24-25.) Avera and Plaintiff interacted a couple of times per month. (Pl. 104:11-17.) In January 2019, Avera met with Boyd and Plaintiff to discuss sales goals. (Pl. 106:10-107:3.) Avera provided instruction on how the Sales Reps should dress and told Plaintiff that she needed to do something with her hair and commented that she could say that to Plaintiff because she had a black daughter-in-law. (Pl. 106:10-107:3.) Plaintiff alleges Avera was aggressive on calls with Plaintiff and Greenway and threatened to fire Plaintiff if she did not do what Avera asked. (Pl. 113:7-10.) Avera did not call Plaintiff names or use racial slurs. (Pl. 113:4-14.) Plaintiff never reported Avera's comments or other conduct. (Pl. 111:4-12.)

21.     Plaintiff alleges that Ruiz and Torres refused to work with her and deleted her orders because she reported the June 20 meeting incident to HR. (Pl. 149:16-25.) Plaintiff never reported this alleged retaliatory conduct to HR or anyone else at Lincare despite Lichtenberg informing Plaintiff during the investigation to contact her immediately if any additional harassment or retaliatory conduct occurred.[24] (Pl. 150:16-19, 162:22-163:9; JL 40:3-12.)

22.     Plaintiff was paid a salary plus commissions at Lincare. (Pl. 40:17-20.) The commission structure for Sales Reps ("Commission Structure") states a commission on a sale is only earned if the following five requirements are met:

1)     the patient is set up;
2)     the patient is qualified for insurance coverage that will pay Lincare on assignment for the specified therapy;
3)     the initial date of service is booked to accounts receivable;

---

[23] Mike Potter eventually took over responsibility for the center in April. (Pl. 104:18-105:7; Potter Dec at ¶1.)
[24] Lichtenberg did not inform Ruiz or Torres that Plaintiff reported their actions. (JL 38:1-15.)

4)      the earning Sales Representative personally obtains all other billing prerequisites; and

5)      the earning Sales Representative has completed timely the SalesForce entries for the sales calls.

(Pl. 96:5-8, Ex. 7.) Plaintiff signed the Commission Structure acknowledging that she understood the five requirements needed to earn commission.[25] (Pl. 94:22-95:19.)

23.     Plaintiff needed to have her SalesForce entries completed in order to receive commissions. (Pl. 99:11-13.) Plaintiff did not keep track of her sales calls in SalesForce throughout the last month of her employment. (Pl. 66:15-20; JL 102:22-103:1; Greenway Dec ¶10, Potter Dec ¶6.) Plaintiff was not entitled to any commissions for sales made in the last month because she did not track those sales. (Greenway Dec ¶10; Potter Dec ¶8; Pl. Ex. 7.)

24.     Plaintiff routinely received commissions. (Pl. 168:16-19.) Plaintiff was paid all commissions properly earned during her employment, including any commissions she was due post-termination.[26][27] (Greenway Dec ¶¶6, 9.) All commissions Plaintiff earned were reflected in her pay records. (Greenway Dec ¶9, Ex. 1 and 2; Pl. 168:20-22.)

25.     Plaintiff understood that if there was an issue with her commissions, she could contact Lincare's corporate office. (Pl. 92:23-93:1.) Plaintiff utilized this process during her employment. (Pl. 93:19-13; 94:1-3.) Plaintiff did not report any unpaid commissions at or near the time of termination. (Greenway Dec ¶7; Potter Dec ¶5.)

---

[25] It was crucial to make sure all paperwork was signed and submitted so she could be paid. (Pl. 167:12-22.)

[26] The Commission Structure states that a terminated Sales Rep's final commission payment will be based on set-ups for which all five requirements for an earned commissioned are met, the commission has not yet been paid, and the commission cycles for payment on the next verification report following the Sales Rep's final work date. (Pl. Ex. 7.)

[27] Plaintiff was paid commissions after she resigned. (Pl. 183:11-19, 185:14-16, Ex. 13.) On August 23, 2019, Plaintiff was paid $242 in commissions for August 5 through August 18, 2019. (*Id.*) On September 6, 2019, Plaintiff was paid $305 in commissions for the period of August 19 to September 1, 2019. (*Id.*)

## II.      MEMORANDUM OF LAW[28]

### A.      Plaintiff's Hostile Work Environment Claims Fail.[29]

To prove her *prima facie* case of hostile work environment, Plaintiff must establish (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her race; (4) the harassment affected a term, condition, or privilege of employment; and if her alleged harasser was a coworker rather than a supervisor, (5) that Lincare knew or should have known about the harassment and failed to take prompt remedial action. *White v. Govt. Employees Ins. Co.*, 457 Fed. Appx. 374, 379–80 (5th Cir. 2012). The legal standard for workplace harassment is "high" and the "harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment." *Saenz-Holt v. Nicholson*, A-06-CA-259 LY, 2007 WL 9709994, at *14 (W.D. Tex. Nov. 9, 2007) (R. Pitman), R&R approved, 2007 WL 9710037 (W.D. Tex. Dec. 12, 2007).

Courts consider a number of factors when determining whether conduct was "severe or pervasive" including: "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating (or whether it is a mere offensive utterance), and whether it unreasonably interferes with the victim's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "Title VII ... is not a 'general civility code,' and 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment." *Id.* The "mere utterance of an …epithet

---

[28] "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (quoting Fed. R. Civ. P. 56(c)). "When considering a motion for summary judgment, the court views all facts and evidence in the light most favorable to the non-moving party." *Id.* "Mere conclusory allegations are insufficient to defeat summary judgment." *Id.*

[29] "The Fifth Circuit analyzes § 1981 claims and TCHRA claims under the same standard as claims under Title VII." *Vital v. Natl. Oilwell Varco*, CIV.A. H-12-1357, 2014 WL 4983485, at *12 (S.D. Tex. Sept. 30, 2014). Therefore, an independent analysis of Plaintiff's three hostile work environment claims is not required.

which engenders offensive feelings" is not enough nor are isolated incidents unless extremely serious. *Johnson v. TCB Const. Co., Inc.*, 334 Fed. Appx. 666, 670 (5th Cir. 2009). "Second hand harassment" is when the plaintiff does not personally hear the remarks or when the remarks were not directed at the plaintiff. *See Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005). "Second hand harassment, although relevant, is less objectionable than harassment directed at the plaintiff." *Johnson*, at 671 (5th Cir. 2009) (citing *Moser*, 406 F.3d at 903.).[30]

Plaintiff's alleged harassing acts were all either second hand harassment and/or isolated incidents committed by different coworkers. Plaintiff was not in the office when Ruiz made the Aunt Jemima comment. Plaintiff did not hear Ruiz call her "loud and black" or "ghetto," and only learned of these alleged comments secondhand from coworkers and has no idea whether they actually occurred. Therefore, they are not proper summary judgment evidence. *See Lohn v. Morgan Stanley DW, Inc.*, 652 F. Supp. 2d 812, 823 (S.D. Tex. 2009) (summary judgment evidence must be based on personal knowledge). Avera's alleged comment about Plaintiff's hair was a one-time incident that Plaintiff never reported. Plaintiff alleges Torres used the N-word on the telephone and when speaking with others and only used it towards her on one occasion during the June 20 meeting. *See White*, 457 Fed. Appx. at 380–81 (referring to someone else as "n***r" and other racially inappropriate comments not directed at plaintiff were not extreme enough to amount a change in the terms and conditions of her employment). The overwhelming evidence—including Plaintiff's own statement prepared one day after the incident, sworn EEOC charge, and Complaint—demonstrates that Torres did not actually call Plaintiff the N-word during the meeting.

---

[30] *See, e.g., McKenzie v. Milwaukee County*, 381 F.3d 619, 624–25 (7th Cir. 2004) (holding that the plaintiff's hostile-work-environment claim failed because many of the incidents were not directed toward her); *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759–60 (8th Cir. 2004) (holding that the plaintiff had failed to present sufficient evidence that the harassment was severe because the alleged comments were not directed toward him, did not refer to him, and in some instances were merely overheard by him); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (the fact that most of the comments were not directed at the plaintiff contributed to the conclusion that the evidence was insufficient to show a hostile work environment).

However, even if that did happen, Plaintiff was only called the N-word on one occasion, which courts have found insufficient to establish a hostile work environment. *See Grant v. UOP, Inc.*, 972 F. Supp. 1042, 1047 (W.D. La. 1996), aff'd, 122 F.3d 1066 (5th Cir. 1997) (the court found that five separate utterances of the "N" word directly to the plaintiff were insufficient to establish a hostile work environment claim); *Anderson v. Sikorsky Support Services, Inc.*, 66 F. Supp. 3d 863, 874 (S.D. Tex. 2014) (court found no hostile work environment when plaintiff was called n****r on one occasion, overheard a supervisor use say "n****r" to another employer, found a note that said "n****r," and observed coworkers drag a noose behind their golf cart).

Plaintiff was not subject to a hostile work environment. Plaintiff only worked in the office at most one day per week and spent the vast majority of her work days in the field making sales calls—not in the office with the alleged harassers. *See Reddy v. Super. Glob. Sols., Inc.*, 4:11-CV-845, 2013 WL 3215740, at *10 (E.D. Tex. June 24, 2013), aff'd sub nom., 572 Fed. Appx. 265 (5th Cir. 2014) (plaintiff who worked remotely could not establish hostile work environment). When Plaintiff did work in the office, she worked on the opposite side of the building than the alleged harassers.[31] Plaintiff testified that she never heard the N-word or any other derogatory racial remarks after the June 20 meeting, which means she would have had nearly two months without being subject to discriminatory comments. The alleged harassers were low-level co-workers who had no supervisory authority over Plaintiff.

Courts in this Circuit faced with significantly more vitriolic allegations have consistently held that the plaintiff did not establish a hostile work environment. *See, e.g., Moore v. United Parcel Serv., Inc.*, 150 Fed. Appx. 315, 319 (5th Cir. 2005) (allegations that supervisors called

---

[31] *See Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 459 (S.D.N.Y. 2013), aff'd sub nom., 588 Fed. Appx. 15 (2d Cir. 2014) (conduct did not adversely affect terms and conditions of plaintiff's employment because it occurred in a different office area than where she worked).

plaintiff a "n****r," a "mother f* * *er," and referred to him as "you people" which were never complained of, and belief that discipline was racially motivated, failed to provide evidence sufficient to create material issue that workplace was abusive or hostile working environment); *Dotson v. Gulf*, 2006 WL 44071, at *13 (S.D. Tex. Jan. 9, 2006) (plaintiff's allegations he was subject to discriminatory discipline, was referred to as a "n****r," and was treated with less cordiality and friendliness than Caucasian employees insufficient to defeat summary judgment motion). In *Johnson*, the plaintiff (a black male) brought a race hostile work environment claim because his supervisor frequently used the term "n****r," and once towards plaintiff stating he was "just like a damn n****r" when he had an issue with his paycheck and again in talking to the plaintiff about a coworker. 334 Fed. Appx. at 668. The Fifth Circuit in *Johnson* affirmed summary judgment holding that the alleged conduct did not constitute a hostile work environment because the one incident where the supervisor called the plaintiff a "n****r" was isolated and the majority of the other times he said "n****r" were either not in the plaintiff's presence or not directed towards him. *Id.* at 671-672. Plaintiff has not established the alleged harassing conduct was sufficiently severe or pervasive and, cannot prove a *prima facie* case of hostile work environment.

Regardless, her claims will still fail because Lincare took prompt remedial action[32] that stopped the alleged harassing conduct. *See Williams-Boldware v. Denton County, Tex.*, 741 F.3d 635, 640 (5th Cir. 2014) ("A defendant may avoid Title VII liability when harassment occurred but the defendant took 'prompt remedial action' to protect the claimant.") In *Carmon v. Lubrizol*

---

[32] The vast majority of the alleged harassment was committed by Plaintiff's co-workers, Torres and Boyd. Thus, Plaintiff must prove that Lincare knew or should have known about the harassment and failed to take prompt remedial action. *White*, 457 Fed. Appx. at 379–80. To the extent Plaintiff argues Avera's comment about Plaintiff's hair and aggressive attitude constituted a hostile work environment, which is not the case, the claim would fail because Lincare took reasonable steps to avoid harassment and Plaintiff unreasonably failed to take advantage of these preventative opportunities. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). Lincare enforced an anti-harassment policy with a reporting procedure for employees to utilize if they needed to complain about harassment and Plaintiff failed to take advantage of these preventative opportunities by not reporting Avera's alleged harassing conduct. *See Lauderdale v. Texas Dept. of Crim. J., Institutional Div.*, 512 F.3d 157, 165 (5th Cir. 2007).

*Corp.*, 17 F.3d 791, 794–95 (5th Cir. 1994) (per curiam), the Fifth Circuit held than an employer took prompt remedial action because "[i]t took the allegations seriously, it conducted prompt and thorough investigations, and it immediately implemented remedial and disciplinary measures based on the results of the investigation." Like the employer in *Carmon*, Greenway immediately reported the June 20 incident to HR, Lincare promptly and thoroughly investigated Plaintiff's complaint and issued remedial action to the alleged harassers **five days later**. Lincare issued final written warnings to the first-time offenders and warned them that further discriminatory and inappropriate comments would result in their immediate termination.

Lincare was not required to terminate Ruiz's or Torres's employment. *See Williams*, 741 F.3d at 640 ("Employers are not required to impose draconian penalties upon the offending employee in order to satisfy the court's prompt remedial action standard."); *Woods v. Delta Bev. Group, Inc.*, 274 F.3d 295, 300 (5th Cir. 2001) (employer was not legally obligated to fire harasser or separate him from plaintiff). In *Houston v. EBI Cos.*, 53 F.3d 1281 (5th Cir. 1995) (per curiam), an employer took prompt remedial action in response to a complaint of a racially offensive comment by giving the harasser a stern warning advising that racially offensive language would not be tolerated in the future, and the harasser did not make any other racist remarks in the plaintiff's presence after the warning. Lincare's remedial action of issuing final written warnings was successful as Plaintiff testified she never heard Torres say the N-word again after or heard other race-related comments from either alleged harasser after the final warnings.[33] *See Skidmore v. Precision Printing and Pkg., Inc.*, 188 F.3d 606, 616 (5th Cir. 1999) ("In many such instances, in determining whether the employer's actions were remedial, we [the Fifth Circuit] have

---

[33] Plaintiff later complained of the "Aunt Jemima" comment, which was made by Ms. Ruiz prior to the final written warning being issued to her. Plaintiff did not personally hear the comment and has no idea when the comment was made and cannot rely on Mr. Gove's hearsay to oppose summary judgment. *See Lohn*, 652 F. Supp. 2d at 824.

considered whether the offending behavior in fact ceased" indicating that the cessation of offending behavior is evidence that an employer's actions were sufficiently remedial).

To the extent Plaintiff alleges the harassment continued after the remedial action, <u>Lincare cannot be liable for conduct of which it had no knowledge</u>.[34] *See Woods*, 274 F.3d at 299 (5th Cir. 2001). In *Woods*, the Fifth Circuit held that an employee's failure to report continued harassment after being instructed to do so by the company was fatal to the employee's hostile work environment case.[35] A plaintiff "cannot rely on his past complaint to [the employer] to shield himself from his obligation to report continuing harassment." *Sims v. Equilon Pipeline, Inc.*, CIV.A. SA-01-CA-0875, 2004 WL 557314, at *14 (W.D. Tex. Feb. 3, 2004) (granting summary judgment because employer had no knowledge of continued harassment even when plaintiff testified he complained before and did not report the co-worker harassment because he believed the company was ineffective at dealing with harassment). Lincare did not have knowledge of any alleged continued harassment prior to Plaintiff's resignation from the company. Plaintiff's hostile work environment claims fail because Plaintiff cannot prove that Lincare failed to take prompt remedial action on any harassing conduct it had or should have had knowledge of and in fact her testimony supports that the conduct did not continue.

## C.     Summary Judgment is Appropriate on Plaintiff's Disparate Treatment Claims[36]

To prove a *prima facie case* of disparate treatment, Plaintiff must prove she (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment

---

[34] While Plaintiff stated generally in her resignation letter that the "harassment continued," she testified that she never heard the N-word and could not identify any other instances of discriminatory conduct she experienced after the final written warnings were issued. (Pl. 159:8-12, Ex. 11.)

[35] The Court's reasoning in *Woods* is on point: ("To avoid further harm after July 7, Woods needed to reasonably take advantage of the corrective opportunities provided by her employer. Woods cannot have expected Delta Beverage to solve her problem when it had no knowledge that she continued to suffer harassment.") 274 F.3d at 299.

[36] The Fifth Circuit analyzes § 1981 claims and TCHRA claims under the same standard as claims under Title VII. *See Vital v. Natl. Oilwell Varco*, CIV.A. H-12-1357, 2014 WL 4983485, at *12 (S.D. Tex. Sept. 30, 2014).

action; and (4) was replaced by someone outside the protected class or, in the case of disparate treatment, was treated more harshly than others who were similarly situated. *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001).

Plaintiff cannot prove constructive discharge. A "constructive discharge" occurs when an employment makes working conditions so intolerable that an employee feels compelled to resign. *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). When evaluating whether Plaintiff's allegations rise to the level of constructive discharge, the Court must examines the following factors: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not. *Carter v. California Grill, LLC*, 1-19-CV-588-RP, 2021 WL 1960629, at *4 (W.D. Tex. May 11, 2021) (R. Pitman). Plaintiff must demonstrate a "greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment claim." *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998). "Discrimination alone, without aggravating factors is insufficient for a claim of constructive discharge." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001).

Plaintiff's alleged harassing conduct does not rise to the level of hostile work environment and, therefore, cannot constitute a constructive discharge. *See Benningfield*, 157 F.3d at 378. Plaintiff did not receive a demotion, reduction in salary or job responsibilities, or reassignment to menial or degrading work. Plaintiff remained working as a Sales Rep spending four out of five days in the field away from the alleged oppressive environment. Plaintiff did not resign amidst the time when the alleged harassment was occurring. Plaintiff searched for jobs, went to interviews, received several offers of employment, and accepted an offer of employment on July 8 with a start

16

date on August 12. Plaintiff didn't resign until August 9 and began work with Medici on August 12. Clearly, Plaintiff was not constructively discharged. *See Regis v. Metro. Jewish Geriatric Ctr*, No. 97 Civ. 0906, 2000 WL 264336, at *12 (E.D.N.Y. Jan. 11, 2000) ("An employee who remains on the job while looking for alternative employment is hard-pressed to establish that her working conditions were intolerable."); *Baptiste v. Cushman & Wakefield*, 03 CIV. 2102, 2007 WL 747796, at *12 (S.D.N.Y. Mar. 7, 2007) ("No reasonable jury could conclude that Plaintiff's working conditions were so intolerable that she was forced to resign when she began looking for work months before resigning and then waited nearly two weeks after she had accepted new employment to formally tender her resignation. It cannot be said that Plaintiff was forced involuntarily to resign when the undisputed facts demonstrate she chose the date and time to do so").[37]

In *Sims v. Brown & Root Indus. Services, Inc.*, 889 F. Supp. 920, 931 (W.D. La. 1995), aff'd, 78 F.3d 581 (5th Cir. 1996), the Fifth Circuit affirmed summary judgment on a constructive discharge claim when the plaintiff resigned without complaining, admitted she had another job lined up at the time of her resignation, and was unable to present any credible evidence that conditions were so intolerable that she was forced to resign. Plaintiff's actions are analogous to the plaintiff's in *Sims*. Plaintiff's conduct demonstrates that she was not compelled to resign, but rather waited until the time suited her.[38]

---

[37] *See also Brown v. Kessler Inst. for Rehab., Inc.*, CIV. 09-338 FSH, 2011 WL 849601, at *9 (D. N.J. Mar. 7, 2011), aff'd, 504 Fed. Appx. 83 (3d Cir. 2012) (granting summary judgment on constructive discharge claim because evidence showed she did not resign as a result of constructive discharge but to seek other employment); *Aguirre v. Valerus Field Sols.*, L.P., CV H-15-3722, 2019 WL 2570069, at *12 (S.D. Tex. Jan. 23, 2019), R&R adopted sub nom., 2019 WL 989413 (S.D. Tex. Mar. 1, 2019) (granting summary judgment on constructive discharge claim pointing out that she resigned only after she started looking for and found another job); *Wagner v. Sanders Assoc., Inc.*, 638 F.Supp. 742, 745-46 (C.D. Cal. 1986) ("If an employee wishes to claim that an employer's act should be deemed a constructive discharge, he must 'put up or shut up.' If he wishes to claim that he had no choice but to leave, he must leave when the choice is posed, not after he has afforded himself the chance to avoid the unpleasant consequences of leaving by obtaining another job.")

[38] *See Champlain v. City of Folsom*, CIVS032018FCD DAD, 2005 WL 3299520, at *4–5 (E.D. Cal. Dec. 6, 2005) ("Plaintiff appears to have taken his time, weighed his options for employment, and only after he secured another job did he resign from his employment with defendant. Defendant is entitled to summary judgment on this claim because a reasonable jury could not find that plaintiff resigned because of the alleged intolerable conditions.")

Plaintiff's constructive termination claim also fails because she never reported any additional harassment to Lincare or provided Lincare with an opportunity to investigate the alleged harassment. If an employee immediately resigns after suffering unlawful discrimination rather than attacking the discrimination within the context of the existing employment relationship, the employee has not been constructively discharged. *Williams v. Barnhill's Buffet Inc.*, 290 F. App'x 759, 762 (5th Cir. 2008) ("An employee who resigns without affording the employer a reasonable opportunity to address her concerns has not been constructively discharged.").[39] Plaintiff reported alleged harassing conduct in the past and had knowledge Lincare investigated and addressed her concerns. Lichtenberg instructed Plaintiff to contact her immediately if she was subjected to additional harassment or retaliation. Plaintiff did not contact Lichtenberg after her July 5 report of the hearsay "Aunt Jemima" comment. Plaintiff resigned on August 9, 2019, stating the harassment continued; yet, she failed to report any alleged conduct from July 5 to August 9. Plaintiff refused to provide detail or an opportunity for Lincare to address the alleged harassment. Plaintiff's blatant failure to report additional harassment "dooms" her constructive discharge claim. *See Hockman v. Westward Commun., L.L.C.*, 282 F. Supp. 2d 512, 526 (E.D. Tex. 2003), aff'd sub nom., 407 F.3d 317 (5th Cir. 2004), and 122 Fed. Appx. 734 (5th Cir. 2004) ("[F]ailing to provide company with a sufficient opportunity to correct the alleged harassment dooms a constructive discharge claim.")

Any other alleged disparate treatment claims are predicated on the same facts as Plaintiff hostile work environment claim and fails for the same reasons as she failed to show she was subjected to an alleged adverse employment action.[40] *Teran v. Consol. Freightways Corp. of*

---

[39] *See also Woods*, 274 F.3d at 301 (for purposes of the constructive discharge analysis, a reasonable employee would have reported the sexual harassment before resigning).

[40] For example, Avera's alleged threats to fire her and aggressive attitude are not adverse employment actions nor has plaintiff provided evidence those actions were related to her race. *Smith v. Univ. of Tex. Health Sci. Ctr. at Houston*, 100 Fed. App'x 980, 985 (5th Cir. 2004) ("Verbal threats of termination and criticism have been held not to rise to the level of an adverse employment action."); *Pierce v. Texas Dep't of Criminal Justice, Institutional Div.*, 37 F.3d 1146,

*Delaware*, CV 00-229 RLP/WWD, 2001 WL 37125312, at *3 (D. N.M. Jan. 17, 2001) (granting summary judgment on disparate treatment claim predicated on same facts as failed hostile work environment claim for same reasons). Plaintiff's disparate treatment claims fail because she cannot establish a theory of constructive discharge or any other alleged adverse employment action.

### D.      Lincare is Entitled to Summary Judgment on Plaintiff's Retaliation Claims

To establish a *prima facie* case of retaliation, Plaintiff must establish (1) she engaged in protected conduct; (2) she suffered a materially adverse action; and (3) a causal connection exists between the protected conduct and the adverse action. *Cabral v. Brennan*, 853 F.3d 763, 766-67 (5th Cir. 2017). Plaintiff's retaliation claims based on a constructive discharge theory fail for the same reasons mentioned above. Any retaliation claims based on Plaintiff's unsupported allegations[41] that Torres and Ruiz failed to work with her and/or deleted her orders fail for several reasons. First, the alleged conduct does not constitute an adverse employment action.[42] *See Nkemakolam v. Northside Indep. Sch. Dist.*, 5:15-CV-99-DAE, 2015 WL 3651546, at *6 (W.D. Tex. June 11, 2015) (supervisor's interference with work performance not adverse employment action for retaliation purposes). Second, Lincare cannot be held liable for the rogue conduct of two low-level, non-supervisory employees. *Brandon v. Sage Corp.*, 808 F.3d 266, 273 (5th Cir. 2015) (In a Title VII retaliation case, an employer can only be liable "for an employment decision made

---

1149 (5th Cir. 1994)) (holding that there is a "narrow view of what constitutes an adverse employment action" and that criticisms, investigations, and even false accusations, among other things, do not qualify).

[41] Plaintiff has not presented any evidence that that these actions occurred. Conversely, Greenway testified that Plaintiff continued working with Ruiz and Greenway without incident. (Greenway 39:6-16.) Ruiz testified she never deleted Plaintiff's orders. (Ruiz 34:6-13.) Plaintiff never complained of the alleged conduct. (Pl. 150:16-19; 162:22-163:9; JL 40:3-12.)

[42] Plaintiff may try to argue that the alleged interference with her orders cost her commissions. However, an argument on whether this constitutes an adverse act is unnecessary because Plaintiff did not track her sales in SalesForce during the last month and a half of her employment, and thus, was not entitled to any commissions during the time period where she alleges her orders were deleted. *Gonzalez v. S.W. Bell Yellow Pages, Inc.*, CIV.A. 3:05-CV-383L, 2007 WL 900768, at *8 (N.D. Tex. Mar. 26, 2007) (unsupported allegations that defendant's retaliatory actions cost her commissions was not an adverse employment action).

by supervisory employees, where the supervisory employees were agents of the employer with regard to the employment status of the plaintiff.") Lastly, even if there was an adverse act, Plaintiff cannot establish that her complaints were the "but for cause" of her voluntary resignation or any other act since Lichtenberg never told Torres or Ruiz about Plaintiff's complaints.[43]

## E.   Plaintiff Failed to Exhaust Administrative Remedies[44]

Plaintiff's Title VII and TCHRA disparate treatment and retaliation claims based on a constructive discharge theory should be dismissed. Plaintiff filed her Charge on July 30, 2019, after she had accepted her new job at Medici and days before she resigned. She did not include or supplement the charge to include claims for constructive discharge. In *Westley v. Potter*, C.A. SA02CA1160-FB, 2003 WL 22324883, at *8 (W.D. Tex. Aug. 19, 2003), plaintiff filed an EEOC charge asserting claims of hostile work environment then later resigned and brought a complaint for claims of hostile work environment and constructive discharge. The court held that "[a]ny complaints lodged before plaintiff's resignation cannot compensate for plaintiff's failure to exhaust his administrative remedies after the alleged discharge occurred. Thus, it is clear that plaintiff did not exhaust his administrative remedies with respect to constructive discharge." *Id.* These claims based on constructive discharge fail.

## F.   Lincare is Entitled to Summary Judgment on Plaintiff's Breach of Contract Claim

Plaintiff alleges that the Commission Structure was a contract and that Lincare breached

---

[43] *See Hodge v. Texas Bldg. & Procurement Commn.*, A-05-CA-482-LY, 2008 WL 11413499, at *6 (W.D. Tex. Jan. 15, 2008), R&R adopted, 2008 WL 11413497 (W.D. Tex. Feb. 5, 2008) (R. Pitman) (granting summary judgment when plaintiff did not prove complaint she made was the "but for" cause of the alleged treatment that led to her constructive termination.)

[44] To bring suit under Title VII, a plaintiff must exhaust her administrative remedies by filing a charge with the EEOC. *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006). Like Title VII, "a TCHRA action requires an exhaustion of administrative remedies that begins with filing a complaint with the Texas Workforce Commission [C]ivil [R]ights [D]ivision." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010). After filing that charge, a plaintiff's complaint may include only those claims within the scope of the EEOC charge or that could reasonably have been expected to grow out of the charge. *Weaver v. Basic Energy Services, L.P.*, MO-13-CV-022, 2014 WL 12513180, at *2 (W.D. Tex. Jan. 8, 2014), *aff'd*, 578 Fed. Appx. 449 (5th Cir. 2014).

the contract because it failed to pay her commissions due at the time her employment was terminated. (Doc. 1.) To prove a *prima facie* case for a breach of contract, Plaintiff must show: (1) a valid contract existed; (2) she performed or tendered performance; (3) Lincare breached the contract; and (4) Plaintiff was damaged as a result of Lincare's breach. *Muskie Proppant, LLC v. Bella Logistics, LLC*, 5:16-CV-580-DAE, 2016 WL 8674063, at *4–5 (W.D. Tex. Dec. 6, 2016). Even assuming the Commission Structure was a valid contract, Plaintiff's claim fails because she did not tender performance and Lincare never breached the contract. Plaintiff admits she was required to complete five requirements to earn commission on a sale, including timely entering her sales in SalesForce. (Pl. 99:11-13.) Plaintiff did not track her sales in SalesForce during the last month she was employed at Lincare.[45] Therefore, Plaintiff did not earn commissions on any sales she made during her final months of employment and Lincare had no obligation to pay her for such. Plaintiff was paid all commissions <u>she earned</u>, including those it was required to pay post-termination, which are reflected in her pay records.[46] Plaintiff has presented no evidence other than her self-serving, conclusory allegation to support her claims, which are insufficient to survive summary judgment. *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (ruling that unsupported, self-serving allegations do not defeat summary judgment). Therefore, Plaintiff's breach of contract claim fails. *See Jourdan v. Schenker Intern., Inc.*, 275 Fed. Appx. 371, 374 (5th Cir. 2008) (granting judgment on breach of contract claim because commissions were unearned by plaintiff prior to his/her termination).

For the reasons mentioned above, Lincare requests the Court enter an Order granting summary judgment and dismissing all of Plaintiff's claims.

---

[45] (Greenway Dec ¶10; Potter Dec ¶6; Pl. 66:15-20.)
[46] (Greenway Dec ¶9.)

Dated: October 14, 2021

Respectfully submitted,

By: /s/ David M. Kalteux
Rachel Z. Ullrich
Texas Bar No. 24003234
rullrich@fordharrison.com

David M. Kalteux (*pro hac vice*)
Florida Bar No. 118746
dkalteux@fordharrison.com

**FORDHARRISON LLP**
1601 Elm Street, Suite 4450
Dallas, Texas  75201
Telephone:  (214) 256-4700
Facsimile:  (214) 256-4701

**ATTORNEYS FOR DEFENDANT
LINCARE INC.**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 14th day of October 2021, a true and accurate copy of the foregoing Defendant's Motion for Summary Judgment and Brief in Support was served via the Court's ECF Filing System to:

Holt M. Lackey
E-Mail:  hlackey@equalrights.law
Jay D. Ellwanger
jellwanger@equalrights.law
Ellwanger Law LLP
8310-1 N. Capital of Texas Hwy, Ste. 190
Austin, Texas  78731

/s/ David M. Kalteux
Attorney

WSACTIVELLP:12644549.1